UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 1, 2015
```

------------------------------------------------------------X

ANDRE D. MUHAMMAD,                              :

                         Plaintiff,   :

                                 :

           -v-                     :

                                 :

ROBERT COHEN, M.D.,                              :

MICHAEL LATUNJI, M.D. s/h/a MICHALE :

LATUNJI, M.D.,                                   :       13-cv-1422 (KBF)

OKECHUKWU IGWE, M.D. s/h/a IGWE      :

OKECHUKWU, M.D.,                                 :       <u>OPINION & ORDER</u>

CHARLES APPIAH, P.A.,                            :

ROBERT BURMEISTER s/h/a                         :

BURNMYSTER, P.A.,                                :

CITY OF NEW YORK s/h/a NEW YORK        :

CITY DEPARTMENT OF CORRECTIONS, :

                                 :

                   Defendants.:

------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      Andre D. Muhammad ("Muhammad" or "plaintiff") filed this action <u>pro se</u> on

March 1, 2013.  (ECF No. 2 ("Compl.").)  On June 18, 2014, plaintiff filed an

Amended Complaint alleging that defendants were deliberately indifferent to his

serious medical needs during his incarceration at Rikers Island, in violation of

42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12132.  (ECF No. 34.)  Before the Court are two motions by defendants to dismiss

the Amended Complaint.[1]  (ECF Nos. 52 and 55.)  For the reasons set forth below,

both motions are GRANTED.

---

[1] Although the title of defendant Robert Cohen's brief refers to "summary judgment," both motions
before the Court are to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of
Civil Procedure.

I.     BACKGROUND

Plaintiff has a variety of complaints about a variety of medical issues.
Although plaintiff had numerous interactions with the medical staff at Rikers
Island during his five- to seven-month incarceration there, he asserts that his
medical needs still were not addressed.  None of plaintiff's alleged medical issues,
however, rises to the level of a medical condition sufficiently serious to implicate
§ 1983.  In any event, plaintiff has not plausibly alleged that any defendant was
deliberately indifferent to any of his medical needs.

The following facts are drawn from the Amended Complaint, the documents
incorporated by reference therein,[2] and plaintiff's opposition.[3]

On October 12, 2011, plaintiff had "an initial Primary Care visit" at the Cylar
House Health Clinic (the "Cylar House") with non-party nurse practitioner Brett
Gray ("NP Gray").[4]  (See Declaration in Support of Defendants' Motion to Dismiss
("Del Vecchio Decl.") Ex. D, ECF No. 56.)[5]  During the visit, NP Gray provided
plaintiff with the following referrals: (1) a urology referral, due to an elevated

---

[2] The Court notes that plaintiff attached various documents to the original complaint but not to the
Amended Complaint.  Given that the docket indicates that this was unintentional (see ECF No. 28),
the Court deems these documents incorporated by reference into the Amended Complaint.

[3] Plaintiff's opposition sets forth certain facts that are not alleged in the Amended Complaint.
Although courts generally do not accept factual allegations raised for the first time in opposition to a
motion to dismiss, some courts have accepted such allegations in pro se cases.  See Goldson v. Kral,
Clerkin, Redmond, Ryan, Perry & Van Etten, LLP, No. 13CV2747-GBD-FM, 2014 WL 4061157, at *3
(S.D.N.Y. July 11, 2014) ("When a plaintiff is proceeding pro se, the Court also may rely on any
opposition papers in assessing the legal sufficiency of the plaintiff's claims." (citation omitted)).  This
Court has considered all of plaintiff's allegations, including those in his opposition.

[4] The Court notes that the patient's name in NP Gray's records is "Andre D. Horn," not "Andre D.
Muhammad."  For purposes of the instant motions, the Court assumes that Andre D. Horn is
plaintiff.

[5] The documents attached to the Del Vecchio declaration are also attached to plaintiff's original
complaint.

prostate specific antigen ("PSA") level of 7.09[6]; (2) a neurology referral, due to a gunshot wound to the lumbar spine that occurred in the 1980s; (3) an ENT referral, due to a history of right buccal squamous cell carcinoma and resection; (4) a referral for a screening eye exam; and (5) a referral for a dental evaluation.  (See id.)[7]

A few weeks later, on November 4, 2011, plaintiff was incarcerated at Rikers Island on a parole violation.  (First Amended Complaint ("Am. Compl.") ¶ 23, ECF No. 34.)  Upon his incarceration, plaintiff underwent a medical intake admission and explained his medical history, needs, and conditions to the medical staff.  (Id.)

On November 5, 2011, plaintiff had a chest x-ray for tuberculosis screening.  (Id. ¶ 24 & Del Vecchio Decl. Ex. E. at 1.)  The x-ray revealed no evidence of tuberculosis, but a metallic bullet was seen over the left lower lobe.  (Id.)  On November 8, 2011, plaintiff had a right hip x-ray due to complaints of pain allegedly resulting from being without "supportive footwear."  (Am. Compl. ¶ 24.)

On November 14, 2011, plaintiff visited defendant Dr. Igwe due to hip pain.  (Del Vecchio Decl. Ex. E at 2.)  Dr. Igwe described plaintiff as "well-appearing, no acute distress."  (Id.)  He assessed "Acq hip deformity NEC" and prescribed Naprosyn 500 mg.  (Id.)

On December 2, 2011, plaintiff was evaluated by non-party Dr. Harjinder Bhatti, a physician at Rikers Island.  (Id. at 4.)  Dr. Bhatti described plaintiff as

---

[6] In the Amended Complaint, plaintiff repeatedly refers to his need for "urology for prostate cancer." However, plaintiff was not diagnosed with prostate cancer until November 28, 2012—approximately seven months after he left Rikers Island.  (See Am. Compl. ¶ 31.)

[7] In his opposition, plaintiff alleges that he was seen "by his primary care physician Jonathan Weinstein and referrals were made for plaintiff to visit a urologist due to a[n] elevated PSA." (Affirmation in Support of Motion Opposing Summary Judgment ("Pl.'s Opp.") at 3, ECF No. 62.) This appears to refer to the same visit to the Cylar House.

"well-appearing" and without urinary complaints.  (Id.)  Dr. Bhatti assessed an elevated PSA level and wrote a referral for a urology consult at Bellevue Hospital. (Id.)[8]

On December 5, 2011, plaintiff filed a grievance stating that he had pins in his right knee and that his knee was swollen due to being off balance.  (Del Vecchio Decl. Ex. F.)  Plaintiff requested an extra mattress, orthopedic shoes, and to see a specialist.  (Id.)  On December 14, 2011, plaintiff wrote a letter to the Inspector General's Office, claiming that unspecified personnel did not enter his medical complaints and Dr. Weinstein's referrals into the computer.[9]  (Del Vecchio Decl. Ex. G.)  Plaintiff did not specifically refer to any of the defendants in the grievance or in the letter to the Inspector General—nor does he allege that any defendant read these documents.

On December 28, 2011, NP Gray wrote a letter to defendant Dr. Cohen regarding plaintiff's October 12, 2011 visit to the Cylar House.  (Del Vecchio Decl. Ex. D; see also Am. Compl. ¶ 31.)  NP Gray's letter noted that plaintiff had not returned for follow-up and was unable to make any of his scheduled referral appointments due to incarceration.  (Del Vecchio Decl. Ex. D.)  The letter set forth the above-listed referrals and the reasons therefor, and indicated that plaintiff had

---

[8] In his opposition, plaintiff alleges that he "went to address his medical needs at sick-call (medical clinic) over (7) seven times with complaints regarding his PSA an[d] requesting to see a Bellevue urologist."  (Pl.'s Opp. at 4.)  According to plaintiff, defendants "delayed any kind of Bellevue doctor's appointments."  (Id.)  Plaintiff does not discuss Dr. Bhatti's urology referral in his opposition.

[9] In the Amended Complaint, plaintiff alleges that he wrote to the Inspector General's Office on December 6, 2011.  (Am. Compl. ¶ 26.)

complained of chronic pain, numbness and tingling in lower extremities bilaterally, frequent infections, and difficulty swallowing.  (Id.)

On January 24, 2012, plaintiff reported to the infirmary where he was allegedly interviewed by non-party Dr. Cherry.  (Am. Compl. ¶ 26.)  Dr. Cherry allegedly informed plaintiff that the interview was in response to plaintiff's December 6, 2011 complaints to the Inspector General's Office.  (Id.)  During the interview, plaintiff told Dr. Cherry that he was "suffering with his lower back and hip along with his right knee from being off balance from not having his shoes [and] climbing stairs."  (Id.)  Plaintiff requested a neurology referral, which was granted. (Id.)  However, plaintiff's requests for the referrals he allegedly received from Dr. Weinstein for cancer follow-up were denied.  (Id.)

Plaintiff's PSA level decreased from 7.09 to 5.53 by January 24, 2012.  (Pl.'s Opp. at 11.)

On February 15, 2012, plaintiff was evaluated by a Rikers Island neurologist who viewed x-rays of plaintiff's spine and prescribed pain medication (oxycodone and acetaminophen 5 mg/325 mg twice per day as needed).  (Am. Compl. ¶ 27.)

On March 12, 2012, plaintiff wrote another letter to the Inspector General's Office.  (Del Vecchio Decl. Ex. H.)  Plaintiff stated that he had not received a response to his previous letter dated December 6, 2011.  (Id. at 1.)  Plaintiff complained about not having his "medical sn[eakers]" and an extra mattress, and stated that the "OBCC medical chief" had refused to renew his pain medication because of plaintiff's complaints about the medical staff.  (See id. at 2-3.)  In his

5

opposition, plaintiff asserts that his complaints to the Inspector General's Office "made [his] medical situation change for the better."  (Pl.'s Opp. at 11.)

Between April and June 2012, plaintiff was transferred out of Rikers Island.[10]  Plaintiff alleges that, to punish him, the Otis Bantum Correctional Center" ("OBCC")—where plaintiff was incarcerated—did not forward any of his prescriptions or referrals to the New York State Department of Corrections.  (Am. Compl. ¶ 27.)  On November 28, 2012, while in state custody, plaintiff was diagnosed with prostate cancer.  (Id. ¶ 31.)

On March 1, 2013, plaintiff filed this action.  Plaintiff alleges that, at all relevant times, defendants were "functioning in the . . . practice of medical services and top level management for the department of Corrections."  (Am. Compl. ¶ 1.)  According to plaintiff, defendants "[c]ollectively individually intentionally maliciously and recklessly unlawfully deprived plaintiff of medical attention" and were deliberately indifferent to plaintiff's medical needs.  (Id.)  Plaintiff alleges that defendants "disregarded information that unconstitutional acts were occurring" (id.), "subjected plaintiff to unnecessary pain and suffering for over 180 days in violation of [§ 1983] when they failed to treat plaintiff for medical needs" (id. ¶ 2), and failed to act on information indicating that plaintiff was suffering from prostate adenocarcinoma and a neurological spine condition "which required immediate medical attention" (id. ¶ 5).

---

[10] In his original complaint, plaintiff alleges that he left Rikers Island on April 16, 2012.  (Compl. ¶ 37.)  In his opposition, however, plaintiff asserts that he was detained on Rikers Island for seven months, placing his departure date at June 2012.  (Pl.'s Opp. at 2.)

Plaintiff's allegations against each defendant are as follows:

**Dr. Cohen**.  According to the Amended Complaint, Dr. Cohen is a "top level management" official employed by the New York City Department of Corrections. (Id. ¶ 8.)  Plaintiff alleges that Dr. Cohen received but failed to take any steps in response to NP Gray's December 28, 2011 letter.  (See id.)

**Dr. Latunji**.  According to the Amended Complaint, Dr. Latunji is "the chief medical director" at the OBCC.  (Id. ¶ 10.)  Plaintiff alleges that he provided Dr. Latunji with a copy of NP Gray's December 28, 2011 letter, but Dr. Latunji failed to act on the information in that letter.  (See id. ¶¶ 11, 30.)  Plaintiff does not indicate when he provided NP Gray's letter to Dr. Latunji in the Amended Complaint.  In his opposition, plaintiff asserts that provided the referrals to Dr. Latunji on November 14, 2011 (Pl.'s Opp. at 6)—that is, 1.5 months before NP Gray wrote the December 28, 2011 letter.

Plaintiff also alleges that he "underwent surgery with his right femur in 1991 which entailed a foot long metal rod with two 12 inch screws.  This injury cause[d] plaintiff's right he[e]l to be shorter th[a]n the left," requiring supportive footwear. (Am. Compl. ¶ 11.)  Plaintiff alleges that he "was arrested in his specialized footwear" (Pl.'s Opp. at 5) and Dr. Latunji "set in motion a policy, practice and custom not to issue plaintiff a current medical consultation for this kind of [footwear]" (Am. Compl. ¶ 11).  Plaintiff alleges that a January 2012 "Notice to Inmates Foot[wear] Policy" required defendant to issue a "medical order to keep plaintiff's supportive footwear from being confiscated."  (Am. Compl. ¶ 11.)  Plaintiff

further alleges that Dr. Latunji told him that he "just wants to be different and have his footwear." (Id. ¶ 25.)

In his opposition, plaintiff alleges that Dr. Latunji told him that if he could provide the requisite documents, his requests for accommodations would be honored, he would receive a urology referral, and his footwear would be returned. (Pl.'s Opp. at 6.) Plaintiff further asserts that his supportive footwear "was mailed home from" on December 8, 2011 and that Dr. Latunji "should be held liable for delay." (Id.)

**Dr. Igwe**.  Plaintiff alleges that Dr. Igwe failed to act on the information contained in NP Gray's December 28, 2011 letter. (Am. Compl. ¶ 15.) The Amended Complaint is silent as to when and how Dr. Igwe learned of the information in NP Gray's letter. In his opposition, plaintiff alleges that he "provided Dr. Igwe the same medical referrals and medical documents" on November 10, 2011. (Pl.'s Opp. at 9.) Plaintiff alleges that Dr. Igwe told him that there was "nothing he could do" and that he "would pass the provided medical information on to the chief," which plaintiff understood to mean Dr. Latunji. (Id.)

**P.A. Appiah**.  Plaintiff alleges that P.A. Appiah "knowingly, willfully, [and] intentionally condone[d] and participated in deprivations during plaintiff's incarceration at the [OBCC] in that plaintiff suffered chronic back and right hip pain from metallic hardware in right leg and hip joints." (Am. Compl. ¶ 18.) Plaintiff alleges that he requested various accommodations, including a medical mattress, lower-level housing, a pass for supportive footwear, pain medications, and "to visit a urologist and neurologist for spine and elevated PSA." (Id.) P.A. Appiah

allegedly refused to enter these requests into the computer.  (<u>Id.</u>)  Plaintiff alleges that "[i]f any of the above accommodations would have been honored it would have alleviated most the hardship pain wise."  (<u>Id.</u>)  Plaintiff does not provide any specific dates of encounters with P.A. Appiah in the Amended Complaint.

In his opposition, plaintiff asserts that he provided "the same medical documents as Dr. Latunji [and] Dr. Igwe" to P.A. Appiah on December 27, 2012. (Pl.'s Opp. at 6-7.)  Plaintiff further asserts that P.A. Appiah refused to enter this information into the computer.  (<u>Id.</u> at 7.)  Aside from a passing reference to lower-level housing, plaintiff's opposition is silent as to the requested accommodations alleged in the Amended Complaint.

The Amended Complaint generally alleges that Dr. Latunji, Dr. Igwe, and P.A. Appiah told plaintiff on multiple occasions "that they would not provide the kind of medical treatment nor accommodations" which plaintiff sought for his pain and treatment.  (Am. Compl. ¶ 32.)  No further detail is provided as to these alleged conversations.

**P.A. Burmeister**.  Plaintiff alleges that P.A. Burmeister "knowingly [and] intentionally condone[d] and participated in deprivations during plaintiff's incarceration at the [OBCC] in that plaintiff suffered chronic pains due to arthritis and scoliosis."  (<u>Id.</u> ¶ 21.)  P.A. Burmeister allegedly knew that plaintiff had visited a neurologist on February 15, 2012 and was prescribed oxycodone and acetaminophen, but refused to re-prescribe the pain medications.  (<u>Id.</u>)  In his opposition, plaintiff asserts that P.A. Burmeister "chose to change the medication to Tylenol medicine for no reason."  (Pl.'s Opp. at 8.)  In the Amended Complaint,

plaintiff alleges that P.A. Burmeister changed his Tylenol prescription from four tablets twice per day to two tablets twice per day on October 28, 2013.[11]  (Am. Compl. ¶ 21.)

**The City of New York**.  Plaintiff alleges that after a visit with non-party Dr. Lieberman, an orthopedist at Rikers Island, he realized "that there is a[n] unwritten practice, policy and custom to deny medical footwear at the [OBCC]." (Am. Compl. ¶ 25.)  Plaintiff also alleges that "[t]he Department of New York City Corrections has . . . failed to train its officials and medical rank and file medical employees to act and provide medical attention and assistance to its inmates."  (Id. ¶ 33.)

II.    LEGAL STANDARDS

A.    Rule 12(b)(6)

Under Rule 12 of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570)

---

[11] This allegation is not plausible given that plaintiff was transferred out of Rikers Island not later than June 2012.

(internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

In applying this standard, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences from those allegations in plaintiff's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  However, the Court does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal, 556 U.S. at 678.  The Court will give "no effect to legal conclusions couched as factual allegations."  Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citation omitted).  If the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pleaded allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate.  Twombly, 550 U.S. at 570.

Complaints drafted by pro se plaintiffs are construed "liberally" and interpreted "to raise the strongest arguments that they suggest."  Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)) (internal quotation mark omitted).  Nevertheless, to survive a motion to dismiss, a pro se plaintiff must plead enough facts to state a claim to relief that is plausible on its face.  See LaMagna v. Brown, 474 F. App'x 788, 789 (2d Cir. 2012) (summary order).

When evaluating the sufficiency of the allegations, the Court looks not only to the complaint itself, but also to documents attached to it, incorporated by reference in it, or relied upon by plaintiff in bringing suit.  See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

B.    § 1983

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).

To state a claim under § 1983 claim for deprivation of medical care in violation of the Eighth Amendment, a plaintiff must allege that a defendant undertook "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  The deliberate indifference standard includes both objective and subjective components. See Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011).

To fulfill the objective component, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."  Id. (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted); see also Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998))).  "Factors that have been

12

considered include 'the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" <u>Chance</u>, 143 F.3d at 702 (alteration and citation omitted).

To fulfill the subjective component, "the official charged with deliberate indifference must act with a 'sufficiently culpable state of mind.'" <u>Hill</u>, 657 F.3d at 122 (citation omitted).  "The subjective element requires a state of mind that is the equivalent of criminal recklessness; namely, when the prison official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Hathaway</u>, 99 F.3d at 553 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)).  Mere negligence or medical malpractice is insufficient to meet the subjective component.  <u>See</u> <u>Chance</u>, 143 F.3d at 703; <u>see also</u> <u>Hill</u>, 657 F.3d at 123 ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness . . . .").  In particular, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  <u>Estelle</u>, 429 U.S. at 106.

An individual defendant is not liable under § 1983 absent personal involvement.  <u>See</u> <u>Back v. Hastings On Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 122 (2d Cir. 2004) ("[I]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."

(quoting <u>McKinnon v. Patterson</u>, 568 F.2d 930, 934 (2d Cir. 1977)) (internal quotation marks omitted)); <u>Iqbal</u>, 556 U.S. at 676-77 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. . . . [E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." <u>Richardson v. Goord</u>, 347 F.3d 431, 435 (2d Cir. 2003) (quoting <u>Ayers v. Coughlin</u>, 780 F.2d 205, 210 (2d Cir. 1985)).

Under the Second Circuit's decision in <u>Colon v. Coughlin</u>, 58 F.3d 865 (2d Cir. 1995), the personal involvement of a supervisory defendant could be established via five distinct routes:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

<u>Id.</u> at 873 (citation omitted).[12]

---

[12] Since <u>Iqbal</u>, courts in this district have disagreed over whether the <u>Colon</u> categories continue to apply, and the Second Circuit has yet to provide guidance as to this issue.  <u>See, e.g.</u>, <u>Hogan v. Fischer</u>, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in [<u>Iqbal</u>] 'may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations' . . . ." (quoting <u>Grullon v. City of New Haven</u>, 720 F.3d 133, 139 (2d Cir. 2013))); <u>Qasem v. Toro</u>, 737 F. Supp. 2d 147, 151 (S.D.N.Y. 2010) ("The Second Circuit has not yet addressed how <u>Iqbal</u> affects the five categories of conduct that give rise to supervisory liability under <u>Colon</u>."); <u>D'Olimpio v. Crisafi</u>, 718

C.    <u>Municipal Liability</u>

In order to state a claim for municipal liability, a plaintiff must plausibly allege at least one of the following: (1) plaintiff's injury occurred as a result of "action pursuant to official municipal policy," <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>, 436 U.S. 658, 691 (1978); (2) an official responsible for establishing policy with respect to the subject matter in question caused the alleged violation of plaintiff's rights, <u>see</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480-83 (1986); (3) there exists an unlawful practice by subordinate officials so permanent and well-settled as to constitute "custom or usage," with proof that this practice was so manifest as to imply the acquiescence of officials responsible for policymaking, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127-30 (1988) (plurality opinion); or (4) there is a failure to train or supervise municipal employees that "reflects deliberate indifference to the constitutional rights of [the municipality's] inhabitants," <u>City of Canton v. Harris</u>, 489 U.S. 378, 392 (1989).

D.    <u>ADA</u>

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A person is disabled under the ADA if he or she "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an

---

F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (collecting cases).  The Court's analysis here assumes that the <u>Colon</u> categories continue to apply.

impairment, or (iii) is regarded as having such an impairment." Smith v. Masterson, 538 F. Supp. 2d 653, 657 (S.D.N.Y. 2008) (quoting 42 U.S.C. § 12102(2)) (internal quotation marks omitted), aff'd, 353 F. App'x 505 (2d Cir. 2009) (summary order). To determine whether an individual meets any of these criteria, courts apply a three-part test: "First, a plaintiff must first show that she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity she alleges to be impaired constitutes a 'major life activity.' Third, the plaintiff must show that her impairment 'substantially limits' the major life activity previously identified." Id. (citations omitted).

## III.   DISCUSSION

Plaintiff's allegations are insufficient to state a plausible claim for relief under § 1983 or the ADA as to any of the defendants. Plaintiff's § 1983 claim is based largely on defendants' alleged failure to act in response to NP Gray's December 28, 2011 letter. Yet that letter did not alert defendants to any serious medical condition—nor is there any indication that they learned of any such condition from other sources. None of plaintiff's alleged medical issues is sufficiently serious to be actionable under § 1983. In any event, plaintiff received significant medical attention and treatment at Rikers Island, and has not plausibly alleged that defendants were deliberately indifferent to his medical needs.

First, plaintiff fails to allege that he had a serious medical condition—that is, a condition that may produce "death, degeneration, or extreme pain"—while at Rikers Island. Hill, 657 F.3d at 122 (citation omitted). According to plaintiff, he experienced chronic pain due to a gunshot wound from the 1980s, as well as

arthritis and scoliosis; had an elevated PSA level; had a history of right buccal squamous cell carcinoma; and required special shoes due to a leg-length disparity. However, none of these alleged conditions rises to the level of a sufficiently serious medical condition to satisfy the objective component of deliberate indifference.

As to plaintiff's chronic pain, there are no factual allegations regarding the intensity, frequency, or duration of the pain, the situations or experiences that trigger it, or how, if at all, this pain affected any of plaintiff's daily activities.[13] While chronic pain can be a serious medical condition under some circumstances, see Brock v. Wright, 315 F.3d 158, 163 (2d Cir. 2003), a bare-bones allegation of pain is plainly insufficient to meet the Iqbal/Twombly pleading standard. Similarly, plaintiff's alleged arthritis and scoliosis—to the extent he still had these conditions while at Rikers Island (they were diagnosed in 2003)—are insufficiently serious to trigger § 1983—at least where, as here, there are no allegations as to the level of pain that these conditions caused or how, if at all, they affected plaintiff's daily activities.  See Veloz v. New York, 35 F. Supp. 2d 305, 307, 312 (S.D.N.Y. 1999) (foot condition involving a fracture, bone cyst, and degenerative arthritis is not a sufficiently serious medical condition).

As to plaintiff's history of right buccal squamous cell carcinoma, there is no indication that plaintiff had this carcinoma while at Rikers Island, or that there was any serious risk that it would recur.  Plaintiff does not allege that he had any

---

[13] Aside from a single reference to "a great deal of pain" (with no further detail) (Am. Compl. ¶ 31), the Amended Complaint simply alleges that plaintiff had "chronic pain."

medical needs as a result of his carcinoma history, much less that any defendants knew about and failed to address such needs.[14]

As to plaintiff's leg-length disparity, the documents attached to plaintiff's complaint (Compl. Ex. D) suggest that the disparity was small (1/4-inch)—and plaintiff does not allege that he experienced any significant pain or physical limitations due to a delay in receiving supportive footwear, or that such delay endangered his health or safety.  See Cole v. Fischer, No. 07 Cv. 11096(BSJ), 2009 WL 1514699, at *8 (S.D.N.Y. May 29, 2009) (dismissing a § 1983 claim where plaintiff alleged that "his wheelchair, leg braces, hearing aid, walking cane, and back brace were taken away" and "that he was not given a clean adult diaper" because plaintiff "fail[ed] to allege that any short-term limitation on his medical supplies or therapeutic devices created an excessive risk to his health or safety"), aff'd in part, vacated in part[15], 379 F. App'x 40 (2d Cir. 2010) (summary order); see also Shakur v. Furey, No. 3:08-CV-1187 (VLB), 2010 WL 1416836, at *4 (D. Conn. Apr. 8, 2010) (a disparity of 3/4 or 3/8 inches is not a serious medical condition).

Finally, plaintiff's PSA level, though elevated, was not a condition "that may produce death, degeneration, or extreme pain."  Hill, 657 F.3d at 122.  There are no allegations that plaintiff's PSA level was accompanied by any urological symptoms;

---

[14] In his opposition, plaintiff mentions in passing that he "was suffering an infection with his throat and had difficulty swallowing."  (Pl.'s Opp. at 4.)  To start, the allegation as to the infection is wholly absent from the Amended Complaint.  In any event, plaintiff does not allege any facts in connection with this alleged infection and difficulty swallowing.  In particular, plaintiff does not allege when he had these conditions, for how long, what, if any, pain they caused, and how, if at all, they affected his daily activities at Rikers Island.

[15] The Second Circuit affirmed the district court's decision as to the § 1983 deliberate-indifference claim.  See Cole v. Fischer, 379 F. App'x 40, 43 (2d Cir. 2010).

in fact, NP Gray's referral indicates that plaintiff had "[n]o urinary complaints." (Del Vecchio Decl. Ex. D.)  Moreover, plaintiff's PSA level decreased from 7.09 in September 2011 to 5.53 in January 2012, when plaintiff was at Rikers Island.  (Pl.'s Opp. at 11.)[16]

Next, even assuming that plaintiff's conditions were sufficiently serious, the Amended Complaint is devoid of any factual allegations suggesting that any defendant acted with a "sufficiently culpable state of mind"—that is, criminal recklessness—with respect to that condition.  The Amended Complaint repeatedly recites the words "intentionally," "maliciously," and "recklessly"—but does not allege any facts suggesting that defendants were aware of and disregarded any excessive risk to plaintiff's health.  See Hill, 657 F.3d at 122.  NP Gray's letter—even assuming that all defendants received it—did not identify any medical emergency or even a diagnosis, and there is no allegation that defendants learned of any serious risk to plaintiff's health from some other source.[17]  There are also no factual allegations that defendants disregarded any risk to plaintiff's health.  To the contrary, plaintiff received significant medical attention and treatment at Rikers

---

[16] Plaintiff refers to his decreased PSA level for the first time in his opposition.  Defendants did not raise this issue in their opening briefs.  The Court construes plaintiff's statement as to his decreased PSA as an admission; as such, it is properly before the Court on the instant motions.

[17] Plaintiff alleges that, in addition to NP Gray's letter (or the information therein), defendants were provided with (1) a radiology consultation report dated November 29, 2002, which indicates there is a bullet fragment in the right side of plaintiff's back posteriorly; (2) a letter addressed to plaintiff from Deputy Commissioner/Chief Medical Officer Lester N. Wright, M.D., MPH dated January 29, 2004, which provides that plaintiff was diagnosed with arthritis and scoliosis on or about December 12, 2003; and (3) an operation record from Bellevue Hospital Center, dated September 18, 1990, which provides that plaintiff had sustained a hip fracture.  (Am. Compl. ¶ 30; see also Compl. Ex. D.)  Plaintiff does not provide any information as to when and how defendants received these documents—nor does he refer to them beyond asserting that defendants received them.  In any event, these dated documents, even if received, did not alert defendants to any serious risk to plaintiff's health.

Island, including x-rays of his chest and right hip, a consult with an orthopedist, referrals for urology and neurology consults, a prescription for Naprosyn from defendant Dr. Igwe for hip pain, and a prescription for pain medication from a neurologist.[18]  In particular, plaintiff's elevated PSA was adequately addressed by the medical staff at Rikers Island:  On December 2, 2011—less than a month after arriving at Rikers Island—plaintiff received a referral for a urology consult at Bellevue Hospital based on his elevated PSA level.  According to plaintiff's own opposition, his PSA level was measured at the end of January 2012, and the level had decreased to 5.53.[19]  (See Pl.'s Opp. at 11.)

In sum, there are no factual allegations that plaintiff's treatment at Rikers Island was somehow medically inadequate—and plaintiff cannot state a § 1983 claim by alleging simply that he disagrees with his treating doctors as to the best treatment plan.  See Chance, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." (citation omitted)); Whitfield v. O'Connell, 402 F. App'x 563, 565 (2d Cir. 2010) (summary order) ("[D]isagreement with the type of medical care provided is insufficient to state a constitutional claim; rather, '[t]he essential test is one of medical necessity

---

[18] It is immaterial that plaintiff received some of this medical treatment from Rikers Island medical employees who are not defendants in this action.  Defendants were entitled to rely on plaintiff's treatment records in determining which actions to take and not to take in connection with plaintiff's medical needs.

[19] While plaintiff does not explicitly state that his PSA level was measured in January 2012, that is implicit in his assertion that the PSA level was 5.53 at that time.

and not one simply of desirability.'" (emphasis in original) (quoting <u>Dean v.</u> <u>Coughlin</u>, 804 F.2d 207, 215 (2d Cir. 1986)); <u>Williams v. Wright</u>, 162 F. App'x 69, 71 (2d Cir. 2006) ("The law is well established that a 'prisoner's right is to medical care—not the type or scope of medical care which he personally desires.'" (quoting <u>United States ex rel. Hyde v. McGinnis</u>, 429 F.2d 864, 867-68 (2d Cir. 1970)); <u>Fox v.</u> <u>Fischer</u>, 242 F. App'x 759, 760 (2d Cir. 2007) (summary order) (affirming the dismissal of a § 1983 claim where plaintiff "received substantial medical treatment for his ear and sinus problems . . ., including treatment by a specialist, x-rays, and two courses of antibiotics" and rejecting plaintiff's allegations that his treatment was "insufficient and ineffective" as, "at best, a medical malpractice claim").

Plaintiff's additional allegations against Dr. Latunji, P.A. Appiah, and P.A. Burmeister also do not suffice to plead the subjective component of deliberate indifference.

As to Dr. Latunji, plaintiff alleges that Dr. Latunji confiscated and/or refused to provide necessary supportive footwear.  However, this allegation, without more, is insufficient.  There are no factual allegations that Dr. Latunji was, at the relevant time, aware of any disparity in the length of plaintiff's legs, or that such disparity necessitated the use of supportive footwear.  Without alleging such knowledge, plaintiff cannot plausibly allege that Dr. Latunji acted with a state of mind equivalent to criminal recklessness.

As to P.A. Appiah, plaintiff alleges that the physician assistant refused to enter plaintiff's requests for various accommodations—namely, a medical mattress, lower-level housing, a pass for supportive footwear, pain medications, and to visit a

urologist and neurologist—into the computer.[20]  However, plaintiff does not allege any facts indicating that, in doing so, P.A. Appiah was aware that plaintiff had any medical condition requiring such accommodations.  Without such allegations, plaintiff cannot plead the subjective component of deliberate indifference.  See Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987) ("In the absence of any medical proscriptions known to [the defendant], his decision to ignore [plaintiff's] complaints amounted to nothing more than a mere negligent act, which is not a violation of either the Fourteenth Amendment or the Eighth Amendment." (citations omitted)).

As to P.A. Burmeister, plaintiff alleges that P.A. Burmeister prescribed Tylenol instead of plaintiff's previous pain medication and/or changed the dosage of Tylenol.  However, plaintiff's disagreement with P.A. Burmeister's medical decision as to the appropriate medication or dosage does not create a § 1983 claim.  See Chance, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); see also Bryant v. Wright, 451 F. App'x 12, 14 (2d Cir. 2011) ("It is a common exercise of judgment to place prisoners on generic medications, and this act, without more, does not suggest the recklessness necessary for a constitutional claim of deliberate indifference." (citations omitted)).  Moreover, plaintiff does not allege that the change in medication caused him any serious harm or that P.A. Burmeister made the change with a culpable state of mind.  See Fox, 242 F. App'x at 760 ("[T]he fact that

---

[20] Notably, plaintiff does not provide any factual background about this alleged encounter with P.A. Appiah—including when and where it took place.  In his opposition, plaintiff's allegations as to P.A. Appiah are different.  There, he alleges that P.A. Appiah refused to enter his medical information—presumably the information in NP Gray's letter—into the computer.

[plaintiff] was provided Claritin as a substitute for Allegra fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim, and there is no indication that defendants made the substitution with a sufficiently culpable state of mind . . . ." (citations omitted)).  In any event, failure to enter certain information into the computer does not amount to a § 1983 violation.

The claims against Drs. Cohen and Latunji—both of whom allegedly held supervisory roles (see Am. Compl. ¶¶ 8, 10)—fail for an additional, independently sufficient reason: the Amended Complaint fails to allege that these defendants were personally involved in any treatment that plaintiff received or did not receive at Rikers Island.  There are no allegations that these doctors ever treated or examined plaintiff.  To the extent that plaintiff relies on NP Gray's letter, it is clear that mere receipt of a letter listing various referrals does not constitute personal involvement. See Flynn v. Lee, 2012 U.S. Dist. LEXIS 108626, at *7 (S.D.N.Y. July 31, 2012) ("[T]he law in this Circuit makes clear that mere receipt of an inmate's letter, grievance, or appeal does not make a supervisory defendant 'personally involved' for section 1983 purposes." (citations omitted)); see also Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997) (finding that a DOCS Commissioner had no personal involvement where plaintiff had written him a letter and filed with him an appeal he then referred to the prison superintendent for decision).  Nor does plaintiff specifically assert that either Dr. Cohen or Dr. Latunji ignored information that "reasonably should have prompted [them] to investigate." Colon, 58 F.3d at 873.  NP Gray's

letter does not identify any medical emergency, does not state that plaintiff had been diagnosed with any condition, and does not indicate that plaintiff's complaints were not being adequately addressed by medical personnel at Rikers Island.  See Lewis v. Cunningham, No. 05 Civ. 9243, 2011 U.S. Dist. LEXIS 40181, 2011 WL 1219287, at *22-23 (S.D.N.Y. Mar. 14, 2011) ("A high ranking official's inaction is, by itself, insufficient to satisfy the requirement of personal involvement, especially when plaintiff's claims involve medical concerns that may be appropriately delegated to medical staff." (citation omitted)).  To the contrary, plaintiff's medical file includes reports indicating that plaintiff received significant medical attention and treatment at Rikers Island.

Plaintiff has also failed to state a claim of municipal liability against the City of New York (the "City").  To start, and as described above, plaintiff has not adequately alleged a constitutional violation, and there is thus no basis for municipal liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  In any event, plaintiff has failed to plausibly allege that the City is liable for any alleged violation of his rights.  Plaintiff's allegations of "a[n] unwritten practice, policy and custom to deny medical footwear" (Am. Compl. ¶ 25) and a failure to train medical personnel (id. ¶ 33) are unaccompanied by any factual allegations and thus are plainly insufficient to meet the Iqbal/Twombly pleading standard.

Finally, plaintiff's ADA claim merits little discussion.  This claim must be dismissed because plaintiff has not alleged that he is disabled within the meaning of the ADA.  The Amended Complaint contains no facts indicating that plaintiff's alleged medical conditions "substantially limit[ed]" any "major life activity."  The

ADA claim also fails because plaintiff has not alleged that he was discriminated against on the basis of any disability.

IV.    CONCLUSION

For the reasons set forth above, defendants' motions are GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 42, 52, and 55 and to terminate this action.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion & Order would not be taken in good faith and therefore denies in forma pauperis status for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:      New York, New York
            May 1, 2015


                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge

CC:    Andre D. Muhammad
       3025 West 32nd Street Apt. 12-A
       Brooklyn, NY 11224